CITY OF MALVERN *v.* YOUNG.

4-7065                    171 S. W. 2d 470

Amendment to opinion delivered May 17, 1943.

*W. H. McClellan* and *Jim C. Cole,* for appellant.

McFADDIN, J. This appeal involves the ownership of funds of a municipal improvement district, and also involves the validity of a municipal ordinance fixing water rates.

Appellee, as a property owner of Waterworks District No. 12 of Malvern, Arkansas, sought to enjoin the Commissioners of said district (defendants below and appellants here) from transferring $4,909.38 to the City of Malvern. Also appellee, as a property owner and resident of Waterworks District No. 14 of Malvern, sought to enjoin the enforcement of ordinance No. 371 of that city, which ordinance fixed water rates. On this latter phase of the case the defendants below and appellants here are the mayor and Board of Aldermen of the City of Malvern. All defendants demurred generally to the complaint, and when the same was overruled, they elected to stand on the demurrer. The Chancery Court made findings and granted relief in keeping with the allegations and prayer of the complaint; and all defendants have appealed.

## I. The Ownership of the Funds.

Appellee is and was for many years a property owner of Waterworks District No. 12 of Malvern. The district was organized many years ago and issued bonds and constructed a waterworks plant and distribution system to property in that district. Annual assessments of benefits were collected from the real property to and including 1939. For 1940 and 1941, the revenues from the water plant paid the maturing bonds without collection of assessments from the real property. In 1941, all the bonds and indebtedness of the district were paid from the revenues of the water plant, and there remained on hand the sum of $4,909.38 in surplus money. When the bonds and indebtedness of the district were paid, the Commissioners turned over the works to the City of Malvern and were about to turn over the $4,909.38 when appellee filed this suit claiming that this money belonged to the district, and that the Commissioners of the district

should collect all the delinquent assessments and put this money with that collected from delinquent assessments, and then make a final liquidating return to the property holders, as provided for the liquidation of municipal districts. The defendants contended that the money should go to the city along with the waterworks.

From the creation of the Waterworks District No. 12 to the time all of the bonds and indebtedness of the district were paid in 1941, the Board of Commissioners of District No. 12 had managed the affairs of the district, as provided by § 7367 of Pope's Digest. Careful distinction must be drawn between § 7366 of Pope's Digest and § 7367 of Pope's Digest, as these provide for two separate and distinct methods for the operation of a waterworks plant. Section 7366 of Pope's Digest is an Act of 1893, and it provides that after the waterworks plant is constructed the city shall have authority to operate and maintain the plant, instead of the board of commissioners. That section of the digest has been many times construed by this court, and some of the cases are collected and cited in Pope's Digest immediately following the section. We do not have that situation before us in this case, for the commissioners of Waterworks District No. 12 acted under § 7367 of Pope's Digest, which is an Act of 1929; and this section does not appear to have been heretofore construed by this court. The said § 7367 provides that the commissioners of water districts shall control and manage the affairs of the district until the bonds issued to pay therefor shall have been retired, "when they shall turn over the works to the city or town council." The section further provides that as long as the commissioners of the district operate the same, they shall fix the rates, "and such rates shall be fixed as nearly as possible at amounts which will pay the bonds of the district as they mature, so as to relieve the real property of the district as far as possible from the burden of taxation therefor."

We are not here passing on whether § 7366 of Pope's Digest has been repealed by § 7367 of Pope's Digest so far as a water district is concerned. That

question is not before us in this case because the district here involved has proceeded under § 7367. But if there has been no repeal of § 7366, then it is clear that the Legislature has fixed two courses, either one of which may be followed by a municipal district and a municipality: (a) Under § 7366 of Pope's Digest, the commissioners may turn over the operation of the waterworks plant to the city immediately upon the completion of the works (and if that course had been followed here, the cases cited under § 7366 would apply). (b) The board of commissioners itself may continue to operate the water plant until it pays off all the bonded indebtedness and then turn over the works to the city. In the case at bar the latter course was followed. If the former course had been followed, the city council would have fixed the rates when the district was created. Under the course followed in this case, the commissioners themselves fixed the water rates until they paid out the bonds and indebtedness of the district. If § 7366 is not repealed (and on that question we are not passing), then it is clear that the two sections provide alternative methods; and in the case at bar the commissioners have proceeded under § 7367.

It will be observed that under § 7367 the commissioners were to fix the water rates to bring in enough revenue to pay the bonds of the district and to relieve the real property from taxation. Up until 1939, the commissioners collected an assessment from the real property in District No. 12, but for 1940 and 1941 they collected no real property tax. The rates from the water sold paid the maturing bonds and all indebtedness of the district. In fact, it left on hand $4,909.38, and the question is whether that money goes to the city along with the works or whether the money is held by the district for the benefit of the property holders.

This is a suit in equity, and equity treats that as done which ought to be done. 19 Am. Jur. 315; West's Arkansas Digest, "Equity" § 57. The burden imposed on the commissioners was to collect money from the water rates and relieve the real property from the burden of taxation as rapidly as possible. After all the in-

debtedness was paid there should have been no $4,909.38 on hand; and since equity treats that as done which ought to be done, equity treats the $4,909.38 as money of the district and the property holders, and the commissioners of the district should retain this money and not turn it over to the city of Malvern. The said statute provides that the commissioners, when they have paid the indebtedness of the district in full, "shall turn over the works to the city." If the legislature had wanted the commissioners to turn over the excess money, if any, to the city, the Act should have so provided. It does not so provide, and we cannot read language into the statute. The case of *Red River Bridge District* v. *State,* 201 Ark. 365, 144 S. W. 2d 723, is clearly distinguishable from the case at bar. In that case the surplus funds in the hands of the bridge commissioners were turned over to the state. The Act under which the bridge district was created did not contain language such as is contained in § 7367. There is nothing in Act 178 of 1920 nor Act 16 of 1917 requiring the commissioners of the Red River Bridge District to collect enough tolls to reduce the taxes on the property; and that language in § 7367 is of controlling force in the case at bar.

It may be thought that § 7367 of Pope's Digest has been repealed by Act 95 of 1939, but that is without merit so far as the case at bar is concerned. Act 95 of 1939 provided for an elective system of operation of public utilities in cities of the second class and incorporated towns; and § 36 of said Act 95 provided that if the said Act 95 be put into effect in any city of the second class or incorporated town, then anything in § 7367 of Pope's Digest in conflict with said Act 95 be repealed. In the first place, Act 95 of 1939 was never put into effect in Malvern, Arkansas, so it does not apply here. Furthermore, we know judicially that Malvern, Arkansas, is a city of the first class, having been so determined officially by the Board of Municipal Affairs of the State of Arkansas on May 5, 1937; and since Malvern, Arkansas, is a city of the first class, Act 95 of 1939 does not apply

to it, and § 7367 of Pope's Digest is left in full force so far as the City of Malvern, Arkansas, is concerned.

In the brief filed by the appellants in the case, attention was called to the fact that there are some delinquencies for years prior to 1939 in District No. 12. The commissioners of District No. 12 will, of course, collect all of the delinquencies and take the money so received, together with the $4,909.38, and any other moneys on hand, and make a distribution to the property holders in accordance with the cases and rules governing that procedure. We hold that the Chancery Court was correct in overruling the demurrer to the first section of the complaint and in rendering judgment in favor of the appellee on that section.

## II. The Validity of Ordinance No. 371.

After Waterworks District No. 12 of Malvern had constructed its water plant and distribution system, there were organized two other water districts in Malvern known as Waterworks District No. 14 and Waterworks District No. 16, each of which constructed a distribution system, but no plant; and each received its water supply from District No. 12; and District No. 12 charged the water consumers in District No. 14 and in District No. 16 the same rate that was charged by District No. 12 to the water consumers in its own district.

After the commissioners of Waterworks District No. 12 turned over the waterworks to the city of Malvern, in 1941, the City Council of Malvern, on September 1, 1942, passed its ordinance No. 371, by the terms of which users of water in Districts No. 14 and No. 16 were required to pay the City of Malvern a pumping charge or service charge of fifty cents per month over and above the rates charged customers in the territory theretofore lying in Waterworks District No. 12. It seems that the council, in passing ordinance No. 371, labored under the idea that District No. 12 would continue to operate (even though it had turned over its waterworks system to the city) because the ordinance attempted to let District

No. 12 receive this additional fifty-cent charge for some purpose not mentioned. The council might have thought that District No. 12 would continue to get this fifty cents a month to pay back to its property holders. In all events, § 2 of the said ordinance reads as follows:

"Section 2. Since the only source of water available in the City of Malvern was obtained, procured, constructed and paid for by and through Waterworks Improvement District No. 12 and is furnished by and through the distributing system belonging to and constructed by Waterworks Improvement District No. 12, and since Waterworks Improvement District No. 14 and Waterworks Improvement District No. 16 have no water or source of supply of their own and have been and are now receiving water from the system and pumping facilities belonging to District No. 12 at no cost to said district or the consumers residing therein other than the payment by said consumers of the regular water rates, it is determined that a considerable additional expense is required of District No. 12 by the additional burden placed on its operating facilities and by the pumping of said water to the water mains and lines of said District No. 14 and District No. 16, and, therefore, Waterworks Improvement District No. 12 and/or the City of Malvern as the case may be, is hereby authorized and directed to charge the water consumers in District No. 14 and District No. 16, in addition to the minimum charge of $1.50 per month as set out in § 1 hereof, a pumping and operating charge of not more than 50c per month per consumer, for the purpose of defraying the additional expenses created by the furnishing of water to the systems in District No. 14 and District No. 16."

When District No. 12 had turned over its works to the City of Malvern, the district and its commissioners had no right to receive sums of money from further operations. This has already been pointed out in this opinion. There is no need to consider whether the City of Malvern is now the absolute owner of the plant or is merely a trustee. That presents an interesting question involving *Augusta* v. *Smith,* 117 Ark. 93, 174 S. W. 543;

*Arkansas Light & Power Co.* v. *Paragould,* 146 Ark. 1, 225 S. W. 435; § 7394 of Pope's Digest; *Snodgrass* v. *Pocahontas,* 189 Ark. 819, 75 S. W. 2d 223; *Williams* v. *Ft. Smith,* 165 Ark. 215, 263 S. W. 397; and other statutes and cases. We are not deciding that question here; for regardless of absolute or trustee ownership, still the city of Malvern in operating the utility must establish rates that are not discriminatory. When the city of Malvern received the waterworks from District No. 12, the city became the operator of a municipal water plant; and as such is prohibited from practicing discrimination just·as any other public utility is so prohibited. As stated by Professor Pond in the Law of Public Utilities, 4th Edition, Vol. 1, § 280: "The rule prohibiting discrimination in service or rates applies to the municipality equally with privately owned public utilities. . . . . Discrimination in rates or service is not permitted by municipalities any more than private public utilities, and the requirement that a substantial sum be paid by a certain section of the municipality for the privilege of receiving service, which is not required of other customers or sections violates the rule against discrimination. . . ." Many cases are cited by Professor Pond to sustain the text.

In 27 R. C. L. 1449, it is stated: "And a municipality undertaking to supply water to its inhabitants stands in no different relation as to the right to discriminate·from that of a private corporation." In 50 A. L. R. 126, there is a scope note on "Discrimination in the operation of a municipal utility," and scores of cases are cited to sustain the statements heretofore made.

The fact that District No. 12 could have sold water to Districts No. 14 and No. 16 and made a charge therefor (as was done in *Armour* v. *City of Ft. Smith,* 117 Ark. 214, 174 S. W. 234) does not justify the city of Malvern in now discriminating in the rates, as has been shown in the section of the ordinance set out.

When District No. 12 was operating the waterworks, it allowed residents in Districts No. 14 and No. 16 to

894

receive water, at the same rate charged residents in District No. 12. Without any evidence of change in conditions or additional expenditures, etc., the city of Malvern now proposes to charge residents in Districts No. 14 and No. 16 a surcharge. On the face of the record before us this is an unreasonable discrimination.

We are not holding that the city of Malvern could not pass an ordinance reasonably classifying customers as to distance, location, expense of delivery, etc. We are merely holding that the ordinance here involved shows on its face (as previously quoted from § 2 thereof) that it is based on unreasonable discrimination.

Professor Pond in § 275 of his work on Public Utilities says: "Where the location of the prospective customer is unusual and the conditions of furnishing him service are peculiar because of the distance he is removed from the center or thickly populated district of the municipality or because of the sparsely settled condition of his own neighborhood, it is only reasonable that the public service corporation, providing him with its service, be permitted to impose other and different conditions from those applicable to a customer centrally located in the thickly populated district of the municipality. . . . And while the public service corporation can not act arbitrarily or discriminate among its customers, present or prospective, where similarly situated, by way of favoring one customer of a class or one class over others, a distinction may be made between different customers or classes of customers on account of location, amount of consumption, or such other material conditions which distinguish them from each other or from other classes."

In *Freeman* v. *Jones*, 189 Ark. 815, 75 S. W. 2d 226, the city of Searcy constructed an extension to, and supplement of, an already existing sewer system and made an extra charge to patrons who connected to the supplemental system, and that was held reasonable and nondiscriminatory. If the city of Malvern has such a situation as that in its Districts No. 14 and No. 16, then an ordinance setting up such facts would present a situation

different from the ordinance No. 371 now before this court. But from the showing made in the chancery court, § 2 of ordinance No. 371 is unreasonably discriminatory, and is, therefore, void.

The decree of the lower court is in all things affirmed.

SMITH and HOLT, JJ., dissent.