The Honorable David Malone State Senator P.O. Box 1048 Fayetteville, Arkansas 72702-1048
Dear Senator Malone:
This official Attorney General opinion is rendered in response to questions you have raised concerning the validity of acts taken by commissioners who served on a development district board, but who failed to file their oaths of office within the required statutory time period.
You indicate that your questions arise out of a situation in which it was discovered that certain former members of the Off-Street Parking Development District No. 1 of the City of Fayetteville (which was created pursuant to A.C.A. § 14-88-301 et seq.) had not filed their oaths of office within the time period required by law (which is 10 days, see
A.C.A. § 14-88-302). During these commissioners' terms in office, they approved the issuance of refunding bonds for the purpose of refunding certificates of indebtedness that had been issued previously by the District.
You have presented the following questions:
 (1) If the oaths of office taken by the commissioners who serve on an off-street parking development district board were not filed with the time period and in the manner required by law, what effect would this deficiency have on official actions taken by those commissioners?
 (2) If the actions of past commissioners are void ab initio due to the failure of certain commissioners to take the oath of office within the time and manner required by law, is a subsequent board, duly qualified pursuant to law, empowered to ratify past actions of the commission where doing so is in the best interest of the board and the taxpayers?
 (3) Does the parking development district have the power and authority under state law and city ordinances to sell its assets which consist of real property?
 (4) Can the district sell its assets to an entity other than a governmental agency and/or the city in which it is located?
 (5) If the district can divest itself of its real property and pay its bond indebtedness, is the district able to distribute surplus funds, regardless of source, to the owners of the real property that comprises the development district?
RESPONSE
Question 1 — If the oaths of office taken by the commissioners who serveon an off-street parking development district board were not filed withthe time period and in the manner required by law, what effect would thisdeficiency have on official actions taken by those commissioners?
It is my opinion, as explained more fully below, that the commissioners' failure to file their oaths of office within the time period required by law does not affect the validity of any acts taken by them as commissioners.
The requirements regarding the oaths of office taken by commissioners for districts formed under A.C.A. § 14-88-301 et seq. are set forth in A.C.A. § 14-88-302, which states:
14-88-302. Oath of office.
 (a) Each member of the board of improvement, within ten (10) days after his appointment, shall take the oath of' office required by Arkansas Constitution, Article 19, Section 20, add an oath that he will not, either directly or indirectly, be interested in any contract made by the board.
 (b) The oaths of office of the commissioners of municipal improvement districts may be taken before any officer authorized to administer oaths.
 (c) The oath required under this section shall be filed in the office of the city or town clerk.
 (d) If any member of the board shall fail to take this oath and to file it in the office of the clerk within the time allowed in this section, he shall be taken to have declined the office. The city or town council shall at once appoint another person, having the like qualifications, in his place, who shall take and file his oath of office within ten (10) days after his appointment.
A.C.A. § 14-88-302.
The Arkansas Supreme Court has had opportunity to interpret the above-quoted provision on several occasions. In doing so, however, the court has never directly addressed the question you have raised. But the issue did arise indirectly in Hickey v. Hargrave,194 Ark. 64,105 S.W.2d 88 (1937). In that case, a board member of a street improvement district that had been formed under the authority of the statutory scheme that is now codified at A.C.A. § 14-88-301 et seq.
was duly appointed to the board, but failed to take the oath of office. After this board member had served on the board for two and a half years, the city council, without notice to the board member, declared a vacancy in his position, and appointed another person to fill it.
The court upheld the city council's action, holding that the applicable oath requirement (i.e., the oath requirement that is now codified at A.C.A. § 14-88-302, quoted above) is mandatory, and that a failure to comply with it imposes upon the city council the duty to replace the board member in question. The displaced board member argued that he was a de facto officer and was entitled to notice and a hearing before his position could be declared vacant. The court rejected this argument, and held that for purposes of "direct attack" (i.e., for purposes of determining the limited issue of whether the city council acted appropriately), the board member was not deemed a de facto officer.
However, the court also pointed out that the case was not a collateral attack on any actions taken by the board member who had failed to comply with the oath requirements. If it had been, the court stated, the provisions of law upon which the board member's arguments had been based would have been applicable. Id. at 65. This statement by the court appears to indicate that if presented with the question you have raised, the court might well conclude that for purposes of determining the validity of acts taken by a commissioner who has failed to comply with the oath requirement of A.C.A. § 14-88-302, the commissioner should be deemed a de facto officer. As such, the commissioner's acts would be valid. Such a conclusion would be consistent with later holdings of the court interpreting statutes similar to A.C.A. § 14-88-302.
For example, in Pennington v. Oliver, 245 Ark. 251, 431 S.W.2d 843
(1968), the members of a county equalization board were not in strict compliance with the applicable statute governing their eligibility to serve. (A.S.A. 84-704 et seq., now codified at A.C.A. §§ 26-27-301 etseq.) One of the allegations (that was conceded) was that the board members had failed to take the oath of office within the time period required by law (which, under A.S.A. § 84-705, was "before entering upon the discharge of his duties"). During their term on the board, these board members approved a 10% assessment increase on real estate in the county. Their challengers argued that this assessment should be set aside on the grounds that the board members' act of approving it was invalid due to their lack of compliance with the eligibility requirements, including the oath requirement.
The court rejected the argument and upheld the board members' acts as valid, finding that the members constituted de facto board members. It is well-established that the acts of de facto officers are valid. Chronisterv. State, 55 Ark. App. 93, 931 S.W.2d 444 (1996); Ops. Att'y Gen. Nos.97-257; 97-003.
With regard to this issue, the Pennington court stated:
 [W]e conclude that [the board members in question] were de facto members of the Board, and that their actions were therefore valid. This is in accord with the holdings of this Court in Faucette, Mayor v. Gerlach, 132 Ark. 58, 200 S.W. 279. There we find this statement:
 "A person who enters into an office and under takes the performance of the duties thereof by virtue of an election or appointment, is an officer de facto, though he was ineligible at the time he was elected or appointed, or has subsequently become disabled to hold the office. Indeed, it is settled by a current of authority almost unbroken for over 500 years in England and this country, that ineligibility to hold an office does not prevent the ineligible incumbent, if in possession under color of right and authority, from being an officer de facto with respect to his official acts, in so far as third persons are concerned."
Pennington, supra, at 254.
It has also been stated that
 it is generally held that persons having color of title may be regarded as de facto officers, even though legally they are not eligible for the position or do not possess the statutory qualifications for the office. One duly appointed or elected to an office but who has failed to take the oath required or to execute a bond within the time prescribed, or one whose bond is irregular, is at least a de facto officer so that his acts are valid as to the public.
67 C.J.S. Officers 269.
Moreover, this office has previously opined that the failure to take an oath of office as required by law does not affect the validity of acts taken by the person who failed to take the oath. See Op. Att'y Gen. Nos.93-031; 92-168.
For the foregoing reasons, I conclude that the actions of the commissioners about whom you have inquired cannot be challenged collaterally. Because these commissioners would likely be held by a court to constitute de facto commissioners, the actions taken by them as commissioners would accordingly be deemed valid.
Question 2 — If the actions of past commissioners are void ab initio dueto the failure of certain commissioners to take the oath of office withinthe time and manner required by law, is a subsequent board, dulyqualified pursuant to law, empowered to ratify past actions of thecommission where doing so is in the best interest of the board and thetaxpayers?
Because I have opined that the actions of past commissioners were valid despite their failure to take the oath of office within the time period required by law, this question is moot.
Question 3 — Does the parking development district have the power andauthority under state law and city ordinances to sell its assets whichconsist of real property?
It is my opinion that the parking development district does have the power under state law to sell its real property. (Although I am not in a position to comment on the specific authority granted by any particular city ordinance, I note that such ordinances may not conflict with state law. See Ark. Const., art. 12, § 4; A.C.A. § 14-43-601(a)(2).)
The authority of an improvement district to sell its real property arises out of A.C.A. § 14-88-501, which explicitly permits improvement districts to sell or lease their improvements. More specifically, that statute states in pertinent part:
14-88-501. Sale or lease of improvements.
 (a) Any improvement district organized under the provisions of this chapter after February 1, 1967, may sell or lease its improvement, or any part thereof' to the city or town or to a public authority or other agency serving on behalf of the property owners of the district on such terms as the commissioners of the improvement board may deem for the best interest of the district and apply the proceeds therefrom on the payment of the principal of and interest on its outstanding bonds, if any, together with any paying agent's or other charges in connection therewith.
A.C.A. § 14-88-501(a).
Real property owned by an improvement district would clearly constitute an improvement of the district, or a part thereof, within the meaning of the above-quoted statute.
Under the plain language of this provision, I must conclude that the parking development district about which you have inquired is authorized by state law to sell its assets that consist of real property.
Question 4 — Can the district sell its assets to an entity other than agovernmental agency and/or the city in which it it located?
It is my opinion that the answer to this question will depend upon the meaning of the term "governmental agency," as you have used it.
The entities to whom improvement districts can sell or lease their improvements are set forth in A.C.A. § 14-88-501, quoted above, and include "the city or town or to a public authority or other agency serving on behalf of the property owners of the district." The limiting requirement of this provision appears to be that the entity to whom improvements are sold or leased must serve on behalf of the property owners of the district. It is clear that normally, such an entity would be a governmental entity. However, the Arkansas Supreme Court has never addressed the question of whether such an entity could be a private entity. The language of the statute is stated broadly enough to include private entities, as long as they serve on behalf of the property owners of the district. Therefore, until this question has been clarified either legislatively or through judicial interpretation, I conclude that the district can sell its assets to any entity that serves on behalf of the property owners of the district.[1]
Question 5 — If the district can divest itself of its real property andpay its bonded indebtedness, is the district able to distribute surplusfunds, regardless of source, to the owners of the real property thatcomprises the development district?
I must note as an initial matter that neither Arkansas' statutes nor its constitution address the precise question that you have raised. Moreover, the Arkansas Supreme Court has not addressed the precise question in the course of interpreting current constitutional and statutory law. For that reason, the issue remains unresolved, and your question, therefore, cannot be answered definitively. Nevertheless, the available court decisions on similar questions do provide some guidance in evaluating the issue. It should be noted, however, that these cases provide guidance only, and not definitive answers. Accordingly, the issue of the proper disposition of surplus funds held by an off-street parking development district can only be definitively resolved through legislative clarification or judicial interpretation.
Although I do not reach any definitive conclusions regarding this matter, I do note that the most analogous court decisions appear to support an argument that if the district has paid its bonded indebtedness, any surplus funds held by the district can be paid to the property owners in the district.
As previously noted, there is no statute setting forth a required distribution of surplus funds held by an off-street parking development district. When the Arkansas Supreme Court has considered the disposition of surplus improvement funds in the absence of statutory or constitutional direction, it has fairly consistently rejected a disposition to the city or other governmental entity and has recognized and upheld the right of individual property owners to challenge such a disposition.
The most explicit statement by the court on a similar issue appears inCity of Malvern v. Young, 205 Ark. 886, 171 S.W.2d 470 (1943). In that case, a waterworks district had paid all of its bonded indebtedness and held surplus funds in the amount of $4, 909.38. The applicable statute only authorized the commissioners to turn the waterworks itself over to the city; it did not authorize them to relinquish surplus funds. Nevertheless, after the payment of all debts, the commissioners of the district turned the waterworks over to the city and intended to turn over the surplus funds as well, when the plaintiff, who was a property owner in the district, filed suit claiming that the funds belonged to the district, and that the district's commissioners should distribute it to the district's property owners. The court agreed, stating:
 This is a suit in equity, and equity treats that as done which ought to be done. The burden imposed on the commissioners was to collect money from the water rates and relieve the real property from the burden of taxation as rapidly as possible. After all the indebtedness was paid there should have been no $4,909.38 on hand; and since equity treats that as done which ought to be done, equity treats the $4,909.38 as money of the district and the property holders, and the commissioners of the district should retain this money and not turn it over to the city of Malvern. The said statute provides that the commissioners, when they have paid the indebtedness of the district in full, "shall turn over the works to the city." If the legislature had wanted the commissioners to turn over the excess money, if any, to the city, the Act should have so provided. It does not so provide, and we cannot read language into the statute.
City of Malvern v. Young, 205 Ark. at 889 (citations omitted).
The court similarly ordered the distribution of an improvement district's surplus funds to property owners in City of Searcy v. Headlee,222 Ark. 719, 262 S.W.2d 288 (1953). There, the court considered the constitutionality of a statute that required that an improvement district's surplus funds derived from any source be paid into the city treasury. It was argued that the statute violated Amendment 13 to the Arkansas Constitution, which has now been repealed. Amendment 13, which governed local improvement districts, did not explicitly address the disposition of surplus funds, but provided that "no money raised under the provisions of this amendment by taxation or by sale of bonds for a specific purpose shall ever be used for any other or different purpose."[2] The court found that the statute did violate Amendment 13, and ordered the surplus funds paid to the property owners in the district.[3]
The court has reached conclusions consistent with those in the above-discussed cases in various other cases. See, e.g., Searcy Fed.Sav. Loan v. City of Searcy, 221 Ark. 360, 253 S.W.2d 211(1952) (where no statute authorized distribution of surplus funds to consolidated improvement district, and suit was instituted to require such distribution, demurrer to complaint alleging that such distribution would be unconstitutional diversion of funds should have been sustained); Eddyv. Schuman, 206 Ark. 849, 177 S.W.2d 918 (1944) (citizen of a county bridge district had sufficient interest in the district's surplus funds to enable him to maintain suit based on illegal exaction to prevent their payment into State Bridge Bond Retirement Fund); Haraway v. Zambie,203 Ark. 550, 157 S.W.2d 504 (1942) (surplus funds held by a sewer district belonged to the property owners in the district, and Act authorizing payment of such funds to the city was unconstitutional diversion of tax to an unauthorized purpose); Bourland v. Southard, 185 Ark. 627,48 S.W.2d 555 (1932) (surplus funds held by paving improvement district belonged to taxpayers in the district who paid their assessments); PavingDistrict No. 5 v. Fernandez, 142 Ark. 21 (1920) (use of surplus funds of paving improvement district for constructing pavement to be used for making repairs was unconstitutional diversion of funds).
The above-cited weight of case authority appears to support an argument that in the absence of statutory or constitutional direction, surplus funds held by an improvement district should be paid to the property owners in the district.
It should be noted that some Arkansas statutes and its constitution do expressly provide for a distribution of surplus funds other than to the property owners in certain instances. These provisions either direct or suggest payment to the municipality or other governmental entity in which the improvement district is located.[4] Distribution in this manner applies to sewer improvement districts (A.C.A. § 14-89-1303); special improvement districts receiving state aid (A.C.A. § 14-89-1301); airport improvement districts (A.C.A. § 14-89-1304); special non-municipal improvement districts for road improvement, levee, bridge, or drainage construction (A.C.A. § 14-86-1901); improvement districts that are "winding down" and have paid their bonded indebtedness, but which collect funds from the redemption of property (A.C.A. § 14-88-605); certain dissolved improvement districts (A.C.A. § 14-89-1305); and improvement districts governed by Amendment 62 to the Arkansas Constitution (Ark. Const., am. 62, § 5).
The fact that the legislature has expressly provided for distribution in this manner by other improvement districts, but has not done so for off-street parking development districts may indicate an intent that such a district's surplus funds be distributed in accordance with the court's more general holdings.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Suzanne Antley.
Sincerely,
WINSTON BRYANT Attorney General
WB:SBA/cyh
[1] The transaction must, of course, be supported by adequate consideration, so as to avoid a challenge on the grounds of illegal exaction under Article 16, § 5 of the Arkansas Constitution. For a discussion of this issue, see Ops. Att'y Gen. Nos. 97-059; 94-168; 93-070; 92-022.
[2] This language is similar to the language of A.C.A. § 14-88-310, which governs the off-street parking development district about which you have inquired, and which states in pertinent part:
 (a) It shall be unlawful for a municipal board of improvement, or any member thereof to:
 (1) Loan the funds, or to be interested in the loan of the funds, raised in any improvement district; or
 (2) Apply or use the funds for any purpose except the purpose for which they were raised;
A.C.A. § 14-88-310.
[3] It should be noted that Amendment 13 was expressly repealed in 1984 by Amendment 62, § 11 to the Arkansas Constitution. Amendment 62 included a provision that was expressly contrary to the court's interpretation of Amendment 13. Under § 5 of Amendment 62, surplus funds that are subject to that amendment must be paid into the general funds of the municipality or county. That section states in pertinent part: "Upon retirement of the bonded indebtedness, any surplus tax collections which may have accumulated shall be transferred to the general funds of the municipality or county." Ark. Const., am. 62, § 5.
[4] One statute does expressly allow payment of surplus funds to the property owners in the district. That statute is A.C.A. § 14-89-1202, which allows street improvement districts to pay surplus funds to property owners in the district.