The Honorable Stewart K. Lambert, Prosecuting Attorney Third Judicial Circuit P.O. Box 550 Cherokee Village, AR 72525
Dear Mr. Lambert:
You have requested an Attorney General opinion concerning 911 service charges.
You have asked:
 (1) If a county that has already levied a 5% service charge for 911 service wishes to hold an election to raise the charge to 12%, can the issue be placed on the ballot in a manner that would allow the county to keep the 5% charge if the increase fails?
 (2) Can the issue be placed on the ballot so as to provide that if the increase fails, all amounts collected so far would be divided on a pro rata basis among the fire departments in the county?
RESPONSE
Question 1 — If a county that has already levied a 5% service charge for911 service wishes to hold an election to raise the charge to 12%, canthe issue be placed on the ballot in a manner that would allow the countyto keep the 5% charge if the increase fails?
It is my opinion that a county can craft the language of its proposed 12% levy and of the corresponding ballot title in such a way as to assure that failure of the measure will not affect the previous 5% charge. However, it is also my opinion that unless the proposed measure and ballot title are expressly worded so as to provide that failure of the measure will result in a failure of the previous 5% charge (and in the absence of a statute providing for the automatic failure of the previous charge), the previous 5% charge will automatically remain in effect.
The Arkansas Public Safety Communications Act [A.C.A. § 12-10-301 etseq.], which governs 911 service and the charges for 911 service, does not address the issue you have raised. Although the Act provides for the suspension or reduction of the 911 service charge, it does not set forth any requirements regarding an increase of the service charge. It also contains no provisions concerning the permanent termination of the charge. Moreover, it does not provide that the charge must be levied on a recurring basis. Because the Act does not provide for the automatic termination or repeal of the service charge, it is my opinion that once the 911 service charge is levied, it will remain in effect in the amount of the original levy unless it is suspended or reduced pursuant to A.C.A. § 12-10-319, or unless it is replaced by a repeal or amendment of the charge by subsequent ordinance.
This interpretation is consistent with the rule of law concerning county ordinances generally. In the absence of specific statutory authority to the contrary concerning the subject of a particular ordinance, county ordinances remain in effect until they have been repealed or amended by subsequent ordinances. A.C.A. § 14-14-904(1). In the situation you have described (where the proposed 12% charge fails), if the proposed ordinance does not expressly state that its failure is to have the effect of repealing the previously-approved ordinance containing the 5% charge, nothing will have happened to repeal or amend the 5% charge. Whether the proposed 12% charge is worded as a new charge, or as an increase in the old charge, its failure will not have any effect on the previously-approved 5% charge in the absence of an express provision to that effect. Because the Arkansas Public Safety Communications Act contains no such provision, the proposed measure itself must contain such a provision in order to affect the previous 5% charge. Otherwise, the 5% will remain in effect.
Question 2 — Can the issue be placed on the ballot so as to provide thatif the increase fails, all amounts collected so far would be divided on apro rata basis among the fire departments in the county?
It is my opinion that a provision of this nature would be impermissible if the 911 system continues to operate.
The Arkansas Public Safety Communications Act expressly addresses this issue, stating:
 (a)(1) Any revenue generated pursuant to §§ 12-10-318—12-10-321 may be expended only in direct connection with the provision of 911 services and only for the following purposes:
 (A) The engineering, installation, and recurring costs necessary to implement, operate, and maintain a 911 telephone system;
 (B) The costs necessary for forwarding and transfer capabilities of calls from the 911 public safety communication center to dispatch centers or to other 911 public safety communication centers;
 (C) Engineering, construction, lease, or purchase costs to lease, purchase, build, remodel, or refurbish a 911 public safety communication center and for necessary emergency and uninterruptable power supplies for the center;
 (D) Personnel costs in the amount of seventy-five percent (75%) of the salary and benefits of each position charged with supervision and operation of the 911 public safety communication center and system;
 (E) Purchase, lease, operation, and maintenance of consoles, telephone and communications equipment owned or operated by the political subdivisions and physically located within and for the use of the 911 public safety communication center, and radio or microwave towers and equipment with lines which terminate in the center;
 (F) Purchase, lease, operation, and maintenance of computers, data processing equipment, associated equipment, and leased audio or data lines assigned to and operated by the 911 public safety communication center for the purposes of coordinating, forwarding of calls, dispatch, or recordkeeping of public safety and private safety agencies for which the 911 public safety communication center is the public safety answering point and to provide information assistance to those agencies; and
 (G) Supplies, equipment, public safety answering point personnel training, vehicles, and vehicle maintenance, if such items are solely and directly related to and incurred by the political subdivision in mapping, addressing, and readdressing a 911 system.
 (2) Nothing in this subsection shall be interpreted or construed as authorizing a political subdivision to purchase emergency response vehicles, law enforcement vehicles, or other political subdivision vehicles from such funds.
 (b) Expenditure of revenue generated by §§ 12-10-318—12-10-321 for purposes not identified in this section is expressly prohibited.
 (c) Appropriations of funds from any source other than §§ 12-10-318—12-10-321 may be expended for any purpose whatsoever and may supplement the authorized expenditures of this section and may fund other activities of the 911 public safety communication center not associated with the provision of emergency services.
A.C.A. § 12-10-323 (emphasis added).
The revenues to which your question refers are governed by the highlighted portion of the above-quoted section. This section expressly prohibits the use of 911 revenues for purposes other than those listed. Fire departments are not one of the listed uses. Accordingly, I must conclude that this proposed use of these funds is impermissible as long as the 911 system is continuing to operate.
The above-listed uses of the 911 revenues presume, of course, that the 911 system is continuing to operate. The Arkansas Public Safety Communications Act does not address the disposition of funds in a scenario where a 911 system will be discontinued. Because of the absence of statutory guidance on this issue, it is my opinion that only a court can determine the manner in which the collected funds must be distributed.
In this regard, I note that although there is no case law directly on point, certain Arkansas cases can provide guidance on this issue, even though they did not involve the disposition of 911 service charge funds. If these decisions are used as guidance in the scenario involving 911 service charge funds, it is possible that court deciding the issue could order that the amounts collected be "re-levied" for another use, or that they can be refunded to the individual citizens from whom the charges were levied.
These cases that can provide guidance have involved surplus revenues from taxes and surplus funds that had been levied for improvement districts. They indicate that surplus revenues of this nature can either be re-levied for a new purpose, or refunded to the individual citizens from whom they were levied. I reiterate that these cases did not involve 911 service charges and therefore provide guidance only on this issue, rather than binding authority.
With regard to surplus tax revenues, the Arkansas Supreme Court has held that although tax revenues that were levied for one purpose cannot be diverted to another purpose, see Arkansas Constitution, Art. 16, § 11, a tax, once levied, can be re-levied for another purpose. See Hooker v.Parkin, 235 Ark. 218, 357 S.W.2d 534 (1962). A re-levy of tax revenues must be conducted in accordance with the procedures that are required for an original levy of the tax. See Op. Att'y Gen. No. 97-231. Because the Arkansas Public Safety Communications Act is silent on this issue, it is unclear under the law what procedure must be followed in order to re-levy surplus charges. Under the guidance of the tax surplus situation, an election to re-levy the surplus funds would most likely suffice for this purpose. If a court took this approach, it could order that the issue be placed on the ballot so as to provide that if the proposed increase fails, all amounts collected so far would be divided on a pro rata basis among the fire departments in the county.[1]
A court might also order that the collected funds be refunded to the individual citizens from whom the funds were levied.
When the Arkansas Supreme Court has considered the disposition of surplus funds in the absence of a re-levy and in the absence of statutory or constitutional direction, it has fairly consistently rejected a disposition of the funds to a governmental entity, and has recognized and upheld the right of individual property owners to challenge such a disposition. See, e.g., Bell v. Crawford County, 287 Ark. 251,697 S.W.2d 910 (1985).
The most explicit statement by the court on a similar issue appears inCity of Malvern v. Young, 205 Ark. 886, 171 S.W.2d 470 (1943). In that case, a waterworks district had paid all of its bonded indebtedness and held surplus funds in the amount of $4,909.38. The applicable statute only authorized the commissioners to turn the waterworks itself over to the city; it did not authorize them to relinquish surplus funds. Nevertheless, after the payment of all debts, the commissioners of the district turned the waterworks over to the city and intended to turn over the surplus funds as well, when the plaintiff, who was a property owner in the district, filed suit claiming that the funds belonged to the district, and that the district's commissioners should distribute it to the district's property owners. The court agreed, stating:
 This is a suit in equity, and equity treats that as done which ought to be done. The burden imposed on the commissioners was to collect money from the water rates and relieve the real property from the burden of taxation as rapidly as possible. After all the indebtedness was paid there should have been no $4,909.38 on hand; and since equity treats that as done which ought to be done, equity treats the $4,909.38 as money of the district and the property holders, and the commissioners of the district should retain this money and not turn it over to the city of Malvern. The said statute provides that the commissioners, when they have paid the indebtedness of the district in full, "shall turn over the works to the city." If the legislature had wanted the commissioners to turn over the excess money, if any, to the city, the Act should have so provided. It does not so provide, and we cannot read language into the statute.
City of Malvern v. Young, 205 Ark. at 889 (citations omitted).
The court similarly ordered the distribution of an improvement district's surplus funds to property owners in City of Searcy v. Headlee,222 Ark. 719, 262 S.W.2d 288 (1953). There, the court considered the constitutionality of a statute that required that an improvement district's surplus funds derived from any source be paid into the city treasury. It was argued that the statute violated Amendment 13 to the Arkansas Constitution (which has now been repealed). Amendment 13, which governed local improvement districts, did not explicitly address the disposition of surplus funds, but provided that "no money raised under the provisions of this amendment by taxation or by sale of bonds for a specific purpose shall ever be used for any other or different purpose." The court found that the statute did violate Amendment 13, and ordered the surplus funds paid to the property owners in the district.
The court has reached conclusions consistent with those in the above-discussed cases in various other cases. See, e.g., Searcy Fed.Sav. Loan v. City of Searcy, 221 Ark. 360, 253 S.W.2d 211(1952) (where no statute authorized distribution of surplus funds to consolidated improvement district, and suit was instituted to require such distribution, demurrer to complaint alleging that such distribution would be unconstitutional diversion of funds should have been sustained); Eddyv. Schuman, 206 Ark. 849, 177 S.W.2d 918 (1944) (citizen of a county bridge district had sufficient interest in the district's surplus funds to enable him to maintain suit based on illegal exaction to prevent their payment into State Bridge Bond Retirement Fund); Haraway v. Zambie,203 Ark. 550, 157 S.W.2d 504 (1942) (surplus funds held by a sewer district belonged to the property owners in the district, and Act authorizing payment of such funds to the city was unconstitutional diversion of tax to an unauthorized purpose); Bourland v. Southard, 185 Ark. 627,48 S.W.2d 555 (1932) (surplus funds held by paving improvement district belonged to taxpayers in the district who paid their assessments);Paving District No. 5 v. Fernandez, 142 Ark. 21
(1920) (use of surplus funds of paving improvement district for constructing pavement to be used for making repairs was unconstitutional diversion of funds).
The above-cited weight of case authority appears to support an argument that in the absence of statutory or constitutional direction, surplus funds held by a governmental entity should be paid to the individual citizens from whom the funds were levied. Therefore, if a court considering the issue should choose to follow these cases, it could order that the 911 funds that have been collected be refunded to the individual citizens from the funds were levied.
To summarize the above discussion, it is my opinion that:
 (1) If the 911 system is going to continue to be operated, the proposed increase in the service charge cannot be crafted and placed on the ballot so as to provide that upon failure of the proposed increase, all funds collected thus far can be distributed pro rata to the county's fire departments.
 (2) The Arkansas Public Safety Communications Act does not address the disposition of funds collected in a situation where the 911 system is not going to continue to be operated. The disposition of such funds must be determined by a court. A court following case law involving similar (but not identical) situations could order a re-levy of the funds for a different purpose (such as use by the county's fire departments), or could order that the amounts collected be refunded to the individual citizens from whom they were levied.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:SA/cyh
[1] Private fire departments would not, of course, be entitled to any portion of these funds.